The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KING COUNTY,

     Plaintiff,

v.

EXPRESS SCRIPTS, INC., EXPRESS
SCRIPTS ADMINISTRATORS, LLC,
MEDCO HEALTH SOLUTIONS, INC.,
MERCK-MEDCO, ESI MAIL ORDER
PROCESSING, INC., ESI MAIL PHARMACY
SERVICE, INC., EXPRESS SCRIPTS
PHARMACY, INC., EXPRESS SCRIPTS
SPECIALTY DISTRIBUTION SERVICES,
INC., OPTUMINSIGHT, INC.,
OPTUMINSIGHT LIFE SCIENCES, INC.,
THE LEWIN GROUP, INC., INGENIX
PHARMACEUTICAL SERVICES, INC.,
INGENIX, INC., OPTUMRX, INC., and
OPTUM, INC.,

     Defendants.

No. 24-cv-49-BJR

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS**

## I.    INTRODUCTION

     This case concerns the national opioid epidemic. Since 1999, over one million people have died from an overdose involving opioids. Amended Compl. ¶ 29, Dkt. No. 80. The effects of the opioid crisis are visible throughout the nation, including in King County, where opioid use has

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

reached crisis levels and continues to grow. *Id.* ¶¶ 33-34. Plaintiff King County ("the County") initiated the instant action alleging that Defendants[1] played a central role in the over-prescription, misuse, diversion, and abuse of opioids, thereby intentionally creating a public nuisance in violation of RCW § 7.48.130.

Before the Court is Defendants' Motion to Dismiss the County's Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 57. Having fully considered the materials and the relevant legal authorities, the Court denies the Motion to Dismiss. The reasoning for the Court's decision follows.

## II.    BACKGROUND

### A. Procedural History

The Court has detailed the procedural background in its Order Denying Certain Defendants' Motion to Dismiss Amended Complaint for Lack of Personal Jurisdiction, Dkt. No. 84. In short, in 2017, the Judicial Panel on Multidistrict Litigation consolidated, in a multidistrict litigation ("MDL") proceeding, actions seeking to hold various entities responsible for their role in creating the opioid epidemic. *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804. The following year, the County initiated an action against opioid manufacturers, distributors, and pharmacies that was consolidated into the MDL. *King Cnty. v. Purdue Pharma, L.P., et al.*, Case No. 1:18-op-45231 (N.D. Ohio), Compl., Dkt. No. 1-3; Transfer Or., Dkt. No. 9. After the MDL court issued a moratorium on amending complaints, the County filed the instant action in Washington state court. Compl., Dkt. No. 1-2. The case was removed to this Court. Ntc. of Removal, Dkt. No. 1.

---

[1] Defendants include Express Scripts, Inc, Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts Specialty Distribution Services, Inc., OptumRx, Inc., Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., and The Lewin Group, Inc.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 2

The County filed an Amended Complaint—the operative complaint—raising a single claim of public nuisance. Defendants are pharmacy benefit managers ("PBMs"), mail order pharmacies, and related entities. The crux of the Amended Complaint is that Defendants, motivated by profit, colluded with opioid manufacturers and other entities to promote opioid use, thereby substantially contributing to the creation of a public nuisance in King County. *See, e.g.*, Amended Compl. ¶¶ 1-3, 10-22, 24-25, 99-101, 128, 174, 272, 455-61. Defendants now move to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6).

## B.  The Role of Pharmacy Benefit Managers

PBMs are third parties that contract with issuers,[2] employers, and the federal government (collectively, "payors")[3] to administer prescription drug insurance benefits. U.S. Gov't Accountability Off., GAO 24-106898, Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers 7 (2024) [hereinafter GAO Report]. To administer prescription drug insurance benefits, PBMs provide a variety of services. PBMs negotiate rebates and discounts with drug manufacturers on behalf of insurance plans and determine the prices insurers pay and the payments pharmacies receive. *Id.* Rebates are price concessions paid by a drug manufacturer, which may be passed on from PBMs to insurers in part or in full. Nicole Rapfogel, *5 Things To*

---

[2] A health insurance issuer is "[a] health insurance company, service, or organization that must be licensed to engage in the insurance business and is subject to state laws regulating insurance." *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1158 (10th Cir. 2015), *vacated sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016).

[3] In the healthcare industry, a payor (also spelled "payer") refers to any entity that pays for the healthcare services (such as diagnoses, treatments, and other services) received by an individual. *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000, 2017 WL 2797267, at *10 (N.D. Ala. June 28, 2017).

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 3

*Know About Pharmacy Benefit Managers*, Ctr. For Am. Progress (Mar. 13, 2024), https://www.americanprogress.org/article/5-things-to-know-about-pharmacy-benefit-managers/. PBMs can also take on the administrative role of directly reimbursing retail pharmacies on behalf of an insurer. *Id.* Additionally, some PBMs, including Defendants Express Scripts and Optum,[4] have a direct role in the physical distribution of prescription drugs through the operation of mail order pharmacies. GAO Report at 2, 7 n.17; Amended Compl. ¶ 21. Both public and private insurers, including Medicaid, Medicare Advantage plans, employer-sponsored insurance plans, and individual market plans, use PBM services. GAO Report at 7.

Particularly relevant to this case are two of the services provided by PBMs: formulary development and utilization management ("UM"). A formulary is a list of prescription drugs covered by payors. *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 180 (1st Cir. 2024). Some payors develop and manage their own formularies, but most retain PBMs to do so on their behalf. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959, 966 (10th Cir. 2022). The formularies developed by PBMs designate tiers for prescription drugs according to how much consumers owe for a co-payment. *Puerto Rico*, 119 F.4th at 180. For example, a tier-1 drug would require a $5 co-payment, while a tier-2 drug would require a $10 co-payment, and so on. *Id.* PBMs use UM techniques to control access to formularies. *In re EpiPen*, 44 F.4th at 966. Commonly used UM techniques include: (1) formulary

---

[4] The County refers to Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts Specialty Distribution Services, Inc. collectively as "Express Scripts." Amended Compl. at 1. The County refers to OptumInsight, Inc., OptumInsight Life Sciences, Inc., The Lewin Group, Inc., OptumRx, Inc., and Optum, Inc. collectively as "Optum." *Id.*

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

tiering; (2) step therapy, where a consumer is required to try a cheaper drug first before a restricted drug; (3) quantity limits, which limit the dosage or days' supply that a consumer may receive for a prescription; (4) prior authorizations, which are rules that require a physician to confirm that a prescription is therapeutically appropriate before the drug is dispensed; and (5) formulary exclusion. *Id.*; Amended Compl. ¶ 14.

PBMs receive compensation from payors for their services in various ways. Payors may pay PBMs directly for all services provided. GAO Report at 7. Alternatively, payors may pay PBMs a set price for each prescription filled, and the PBMs retain the difference between the price paid by the payor and the price paid to the pharmacy as a form of compensation. *Id.* at 7-8. Additionally, PBMs may retain a portion of manufacturer rebates to offset the fees that payors would otherwise pay. *Id.* at 8. PBMs negotiate rebates from drug manufacturers so the insurance plan contracted with a PBM gets a discount on a drug's "list price," or the initial price set for a drug by manufacturers. Rapfogel, *supra* at 3-4. Manufacturer rebates typically come in the form of a percentage off the list price. *Id.* Therefore, the higher the price of a covered drug, the steeper the potential discount. *Id.* PBMs sometimes retain a portion of the rebate for their own profit instead of passing the full value on to the insurer. *Id.* Therefore, PBMs have an incentive to further maximize profits by steering patients to higher-priced drugs with higher rebates (as a proportion of the list price). *Id.* To accomplish this, PBMs place drugs at more favorable formulary positions (on a tier with lower cost-sharing levels), which encourages consumers to opt for those drug products. *Id.* Drugs excluded from a PBM's formulary must be purchased out-of-pocket by consumers, making them a less desirable option in the marketplace. *Puerto Rico*, 119 F.4th at 180.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### III.    LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### IV.    DISCUSSION

Defendants argue that the County's single claim for public nuisance in violation of RCW § 7.48.130 should be dismissed under Rule 12(b)(6) for several reasons. First, the County's claim is time barred under the statute of limitations. Defs.' Mot. at 5-6. Second, the County fails to adequately allege a public nuisance claim. *Id.* at 6-17. Third, the County's claim is preempted by

the Employee Retirement Income Security Act ("ERISA"). *Id.* at 17-19. Fourth, the County's claim

is preempted by Medicare Part D. *Id.* at 19-20. Additionally, Defendants argue that the County fails

to state a claim against Defendant Optum, Inc., and therefore, Optum, Inc. should be dismissed. *Id.*

at 20. The Court addresses each argument in turn.

### A. Whether the County's Claim is Time Barred

Public nuisance claims are generally subject to a two-year statute of limitations. RCW

§ 4.16.130. "A nuisance cause of action accrues when the plaintiff initially suffers some actual and

appreciable harm or when the plaintiff should have discovered the basis for a nuisance action."

*Wallace v. Lewis Cnty.*, 134 Wn. App. 1, 19 (2006). Defendants argue that the County's claim is

time barred by the statute of limitations. *Id.* at 5-6. Defendants assert that the County must allege

that its injury accrued after October 2021—two years before the County initiated this action—yet

"the amended complaint alleges injuries dating back to at least 2014 and alleges that the County

has taken efforts to remediate those injuries as early as 2015." *Id.* at 5. The Court is unpersuaded

on the presented facts that the County's injuries accrued outside of the requisite period.

The Court finds that the County's mere awareness that criminal activity was occurring and

causing harm more than two years prior to the filing of this action is insufficient to establish that

the County discovered or should have discovered Defendants' actionable conduct at that time.

Notably, the fact that the County began filing lawsuits related to prescription opioid abuse before

October 2021 against *other* defendants does not establish that the County was aware of *these*

Defendants' specific role in any alleged wrongdoing at that time, let alone that Defendants' role

might form the basis of a public nuisance claim. Nor do Defendants dispute that, in 2023, the

County discovered new, previously unavailable information relevant to its public nuisance claim,

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 7

which casts further doubt on the actual date that the County's claim began to accrue. Pl.'s Resp. at 6, Dkt. No. 64; *see also* Decl. of Derek Loeser ¶ 6, Dkt. No. 63.

In multiple other cases arising from the opioid epidemic, courts have rejected statute of limitations arguments similar to those made by Defendants. *See City of Everett v. Purdue Pharma L.P.*, No. C17-209, 2017 WL 4236062, at *8 (W.D. Wash. Sept. 25, 2017); *Cherokee Nation v. Mckesson Corp.*, No. CIV-18-056, 2021 WL 1200093, at *4 (E.D. Okla. Mar. 29, 2021) (rejecting defendants' assertion that amended complaint demonstrated plaintiff's claims accrued in 2014); *City of Boston v. Purdue Pharma, LP*, No. 1884CV02860, 2020 WL 416406, at *11 (Mass. Super. Jan. 3, 2020) (declining to dismiss complaint because plaintiffs sufficiently raised factual issues about when they knew or should have known about alleged harms). In *Everett*, for example, the district court rejected the argument that Everett's public nuisance claim against drug manufacturer Purdue Pharma ("Purdue") was barred by the statute of limitations. *Everett*, 2017 WL 4236062, at *8. The court concluded that "[i]t was not enough for Everett to know that criminal activity was occurring, or that activity was leading to the alleged injuries; Everett's discovery did not occur as a legal matter until it became aware of *Purdue's* negligent and otherwise actionable conduct." *Id.* Defendants have failed to establish that the County's public nuisance claim is barred by the statute of limitations.[5] *See Haslund v. City of Seattle*, 86 Wn.2d 607, 620-21 (1976).

---

[5] The County also argues that (1) it is immune from the statute of limitations pursuant to RCW § 4.16.160, which provides that "there shall be no limitation to actions brought in the name or for the benefit of the state;" and (2) it is entitled to equitable tolling. Pl.'s Resp. at 5-6 (quoting RCW § 4.16.160). However, because the question of when the County discovered the acts that give rise to its cause of action presents a dispositive basis for denying Defendants' Motion to Dismiss based on the statute of limitations, this Court does not reach the County's immunity and equitable tolling arguments.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 8

**B.   Whether the County Adequately Alleges a Public Nuisance Claim**

Defendants next argue that the County fails to adequately allege a public nuisance claim. Defs.' Mot. at 6-17. Under Washington law, "[n]uisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property." RCW § 7.48.120. Washington law further provides that a nuisance claim is "actionable"—i.e., one that is "the subject of an action for damages and other and further relief"— if the nuisance "is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property." *Id.* § 7.48.010.

To establish a claim for public nuisance—the claim the County has asserted here— Washington law requires that the plaintiff show either a violation of one of the statutorily enumerated nuisances in RCW § 7.48.140—none of which are relevant here—or that the nuisance activity "affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." *Id.* § 7.48.130. In determining whether a nuisance claim can be pleaded under Washington law, courts have required that defendants (1) unlawfully committed acts or omitted to perform duties that (2) caused interference with the comfortable enjoyment of life or property and (3) affected equally the rights of a community or neighborhood. *See id.*, § 7.48.010, 7.48.120; *Kitsap Cnty. v. Kev, Inc.*, 106 Wn.2d 135, 139-40 (1986). This Court addresses each of these elements.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS
- 9

### 1.    Whether the County's Allegations Meet the "Unlawful Acts or Omissions" Requirement

Citing to RCW § 7.48.120's language providing that a nuisance consists of "unlawfully doing an act, or omitting to perform a duty," Defendants argue that the County fails to plausibly allege the existence of a legal duty that Defendants owed to the public and violated. Defs.' Mot. at 12-13. However, Defendants raise a straw man. The statutory language is clear that only omissions, and not acts, implicate a duty by defendants. Here, the County's allegations regarding Defendants' misconduct are premised on Defendants' affirmative acts, which independently satisfy the statutory unlawful acts or omissions requirement.

Among the acts alleged by the County are those of "OptumInsight"—comprised of Defendants OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; The Lewin Group, Inc.; and their predecessors, successors, and affiliates—which "worked directly with the Opioid Manufacturers to convince patients, prescribers, payors and the public that long term opioid use was appropriate chronic pain treatment and that opioids were not addictive." Amended Compl. ¶ 99. The County further alleges that Optum, Inc. acted by lobbying state governments to promote its opioid programs and by collaborating with Purdue on studies and presentations that promoted opioid use. *Id.* ¶¶ 174, 305, 313.

To be sure, the County's Amended Complaint makes a few passing references to omissions by Defendants. *Id.* ¶¶ 42 (alleging that venue is proper in the Western District of Washington because a substantial part of the "events or omissions" giving rise to the action occurred within the District), 455 (alleging that Defendants' omissions included "[f]ailing to undertake timely actions utilizing their real-time data that would have drastically reduced the inappropriate prescribing and dispensing of Opioids"). However, these alleged failures by Defendants are not mere oversights,

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

but rather purposeful actions Defendants took to promote opioid use. As such, the County's

allegations are sufficient at this stage to satisfy RCW § 7.48.120's unlawful acts or omissions

requirement.

### 2. Whether Defendants' Acts Caused Interference with the Comfortable Enjoyment of Life or Property

Defendants also argue that the County's public nuisance claim should be dismissed because

the County has failed to plausibly allege (1) proximate causation, and (2) interference with property.

Defs.' Mot. at 6-10, 14-17.

### a. Whether Defendants' Acts Proximately Caused the County's Injuries

Under Washington law, to establish proximate causation, a plaintiff must show that (1) the

defendants' acts are the "but-for" cause of or substantially contributed to the plaintiff's injuries,

(2) the connection between the ultimate result and the acts of the defendants are not too remote or

insubstantial to impose liability, and (3) no independent act breaks the chain of causation thereby

superseding the original act as the proximate cause of the injury. *Michaels v. CH2M Hill, Inc.*, 171

Wn.2d 587, 610-13 (2011); *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478-79 (1998);

*Daugert v. Pappas*, 104 Wn.2d 254, 262 (1985). The Court addresses these requirements in turn.

### i. Whether Defendants' Acts Substantially Contributed to the County's Injuries

This is a case in which, rather than but-for causation, the test for causation is whether

Defendants' conduct was a substantial factor in bringing about the County's injuries. Application

of the substantial factor test occurs when a plaintiff is unable to show that one event alone was a

cause of the injuries. *Daugert*, 104 Wn.2d at 262. Here, the County readily admits that "[t]he opioid

epidemic was partially created and sustained by a wide array of actors in the opioid supply and

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 11

payment chain: Purdue and other manufacturers of prescription opioids . . . distributors, and pharmacies, as well as PBMs . . . ." Amended Compl. ¶ 2. The County's allegations also detail a complex web of actions taken by these entities that makes it "difficult to establish the exact event or party that caused the harm." *Roemmich v. 3M Co.*, 21 Wn. App. 2d 939, 950 (2022).

The Washington Supreme Court has determined that the substantial factor test is appropriate in cases such as this, where a similar, but not identical result would have followed without the Defendants' acts. *Daugert*, 104 Wn.2d at 262. Although the County's Amended Complaint focuses primarily on Defendants' actions, it also references other actors that played a role in creating and maintaining the opioid crisis. In particular, the Amended Complaint refers repeatedly to the actions of opioid manufacturers that collaborated with Defendants on various projects to promote opioid use. *See, e.g.*, Amended Compl. ¶¶ 13, 18, 80, 251. These allegations, along with the County's complaint in the MDL proceeding shows that opioid manufacturers were major players in creating and maintaining the opioid epidemic. *See King Cnty.*, Case No. 1:18-op-45231, Compl.

At the same time, the County sufficiently alleges that Defendants—independently from any other actors—were major players in creating and maintaining the opioid epidemic. The County alleges that, despite knowing that opioids were highly addictive and carried a serious risk of injury and death, Defendants actively promoted opioid use through marketing and lobbying campaigns, and by giving opioids favorable formulary placement, all the while downplaying the potential side effects of the medications. *See, e.g.*, Amended Compl. ¶¶ 15, 99, 142, 174, 233.

       **ii.   Whether the Result and Defendants' Acts are Too Remote or Insubstantial to Impose Liability**

Defendants argue that the County's purported injuries are too attenuated to establish proximate causation. Defs.' Mot. at 14-17. In determining whether defendants' acts are sufficiently

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 12

connected to impose liability, courts consider "'mixed considerations of logic, common sense, justice, policy, and precedent.'" *King v. City of Seattle*, 84 Wn.2d 239, 250 (1974) (quoting 1 Thomas Atkins Street, *Foundations of Legal Liability* 100, 110 (1906)); *Schooley*, 134 Wn.2d at 478-79.

Here, the County has alleged a sufficiently strong and close connection between the County's harms and Defendants' misconduct. The County's allegations paint a detailed picture of how Defendants' actions led to an increase in the number of opioid prescriptions, which led to an increase in opioid addiction, which led to an increase in the abuse of opioids and illicit drugs, which substantially contributed to the myriad of harms detailed in the County's Amended Complaint. Amended Compl. ¶¶ 15, 31, 99, 142, 174, 233, 413-31. Although there are several steps in this causation chain, the Court nonetheless concludes that the connection between Defendants' acts and the alleged harms are not too remote or insubstantial to impose liability on Defendants. *See Alaska v. Express Scripts, Inc.*, No. 23-CV-233, 2024 WL 2321210, at *6 (D. Alaska May 22, 2024) ("The State sufficiently pleads proximate cause[,] as the general kinds of harms alleged here—the oversupply of opioids in Alaska and attendant societal consequences—were foreseeable to an actor that administers prescription drug benefits programs or fills prescriptions in [the] manner Express Scripts did.").

### iii.  Whether an Independent Act Breaks the Chain of Causation

An act that produces an injury generally is the cause of that injury, unless a new, independent act breaks the chain of causation thereby superseding the original act as the proximate cause of the injury. *Roemmich*, 21 Wn. App. 2d at 952. Defendants argue that the County fails to establish proximate causation because the Amended Complaint makes multi-step allegations that

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

rely on independent acts by third parties that break the chain of causation. Defs.' Mot. at 14-17. However, whether an intervening act breaks the chain of causation is a factual question best left to a jury. *See Michaels*, 171 Wn.2d at 613 ("Whether an intervening act breaks the chain of causation is a question for the trier of fact." (quoting *Davis v. Baugh Indus. Contractors, Inc.*, 159 Wn.2d 413, 418 (2007))); *Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225, 1233 (E.D. Okla. 2021) (finding plaintiff's allegations concerning proximate causation sufficient to defeat a motion to dismiss in a case arising from the opioid epidemic). It would be premature for this Court to dismiss the County's claim for failure to establish causation based on the existence of an intervening, superseding act.

### b. Whether Defendants' Acts Interfered with the Comfortable Enjoyment of Life or Property

According to Defendants, Washington law only allows public nuisance claims where there is interference with property. Defs.' Mot. at 6-7. The County responds that Washington law allows for public nuisance claims that allege interference "with life *or* property." Pl.'s Resp. at 7-9. The Court need not decide this issue, however, because the County has sufficiently alleged interference "with the comfortable enjoyment of" property. RCW § 7.48.010.

The County alleges that Defendants' conduct harmed property managed by the County, including parks, bus stops, and areas surrounding King County Metro Transit operations bases. *See, e.g.*, Amended Compl. ¶¶ 413-31. In particular, the County avers that the opioid epidemic has led to an increase in the homeless population that uses County parks for homeless encampments. *Id.* ¶ 416. The County points to syringes as a "near ubiquitous" finding at these encampments, indicating that many of the individuals residing in the encampments are using opioids. *Id.* ¶ 424. The County alleges that employees of County parks have experienced aggressive behavior by

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

individuals who appeared to be under the influence. *Id.* ¶ 426. The County further alleges that these occurrences have deterred people from using the parks and natural areas. *Id.* ¶ 427. Taking these allegations as true, the County has shown that these alleged occurrences have caused King County residents to experience a reasonable apprehension of using County property, which is sufficient to establish that Defendants' actions interfered with the comfortable enjoyment of property. *See Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 923 (2013) ("Where a defendant's conduct causes a reasonable fear of using property, this constitutes an injury taking the form of an interference with property."); *see also Kitsap Cnty. v. Kitsap Rifle & Revolver Club*, 184 Wn. App. 252, 284-85 (2014) (affirming trial court's finding that the operation of a shooting range near residential neighborhoods substantially and unreasonably interfered with the neighbors' use and enjoyment of their properties and were therefore a public nuisance).

### 3. Whether Defendants' Acts Affected the Rights of a Community or Neighborhood

In interpreting RCW § 7.48.130, Washington courts have included the statutory requirement that a plaintiff asserting a public nuisance claim show that defendants' nuisance activities "affect[] equally the rights of an entire community or neighborhood." *Lewis Cnty. v. Bonagofski*, 139 Wn. App. 1033, at *4 (2007). This has also been referred to as the "interference with a public right" requirement. *Id.*; RCW § 7.48.130. Defendants argue that the County's claim does not allege interference with a public right. Defs.' Mot. at 11-12. To the contrary, the County has plausibly alleged that Defendants' misconduct affected the rights of the King County community.

The Washington Supreme Court in *Kev* concluded that an erotic dance studio's "[a]lmost daily violations of controlled substance and prostitution laws is activity that violates the comfort, repose, health, or safety of others, and can clearly affect an entire neighborhood or community."

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

*Kev*, 106 Wn.2d at 139-40. The County alleges that, like the plaintiff in *Kev*, Defendants' misconduct contributed to ongoing violations of drug laws that affected the King County community. Amended Compl. ¶¶ 413-31 ("Today, throughout King County's parks, used syringes are found in abundance, people are routinely found shooting up, and others have overdosed.").

Multiple courts outside of Washington, when addressing public nuisance claims arising from the opioid crisis, have similarly concluded that plaintiffs sufficiently alleged interference with a public right. *See Alaska*, 2024 WL 2321210, at *5; *City and Cnty. of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 1008 (N.D. Cal. 2022) (concluding that plaintiff proved that the opioid epidemic interfered with the public health, the public safety, the public peace, the public comfort, and the public convenience); *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Litig.*, No. MDL 3084, 2024 WL 2261926, at *8 (N.D. Cal. May 16, 2024) (finding allegations of defendant's misconduct adequately described a substantial and unreasonable interference with the public health and the public safety). In *Alaska*, for example, the State of Alaska alleged that the nuisance-creating conduct of Express Scripts led to an increase in the sale and use of illicit drugs, increased burdens on government services, increased homelessness, and negatively impacted the public's ability to enjoy public spaces, among other harms. *Alaska*, 2024 WL 2321210, at *5. Based on these allegations, the court concluded that the State sufficiently pled interference with "the public health, the public safety, the public peace, the public comfort and the public convenience." *Id.* Here, the County's similar allegations regarding homelessness and illicit drug use on public property adequately allege interference with a public right. Amended Compl. ¶¶ 413-45.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

1

### C.  Whether ERISA Preempts the County's Claim

2      Because the County's claim makes reference to and has a connection with ERISA plans,

3   Defendants posit that the County's nuisance claim is preempted by ERISA. Defs.' Mot. at 17-19.

4   ERISA creates standard procedures and oversight systems for employer-sponsored retirement plans

5   and health plans. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320-21 (2016). The provisions of

6   ERISA "supersede any and all State laws insofar as they . . . relate to any employee benefit plan."

7   29 U.S.C. § 1144(a). This includes "all state common law causes of action." *Olson v. Gen.*

8   *Dynamics Corp.*, 960 F.2d 1418, 1420 (9th Cir. 1991). The Supreme Court has acknowledged the

9   "clearly expansive" nature of ERISA's express preemption clause. *New York State Conf. of Blue*

10  *Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995); *Gobeille*, 577 U.S. at

11  319. However, in recognition of the need for workable standards in addressing issues of ERISA

12  preemption, the Supreme Court has identified two categories of state laws that implicate ERISA's

13  preemption provision: those that have a "reference to" ERISA plans and those that have an

14  impermissible "connection with" ERISA plans. *Gobeille*, 577 U.S. at 319-20.

15      ERISA does not preempt the County's claim under either category. Under the "reference

16  to" category, state law is preempted where the existence of ERISA plans is essential to the law's

17  operation or if "the existence of [an ERISA-covered] plan is a critical factor in establishing liability"

18  and there would be "no cause of action if there [was] no plan." *Id.*; *Ingersoll-Rand Co. v.*

19  *McClendon*, 498 U.S. 133, 139-40 (1990). Here, the existence of ERISA-covered plans is not

20  essential to the County's claim. It is true that the County's Amended Complaint addresses

21  Defendants' conduct with respect to standard formularies and UM techniques that are offered to

22  insurers and plan sponsors. Amended Compl. ¶¶ 3, 10, 15, 455. Additionally, Defendants assert

23

ORDER DENYING DEFENDANTS'
24  MOTION TO DISMISS

25

(and the County does not dispute) that some plan sponsors that adopt Defendants' formularies and utilize Defendants' UM services are covered by ERISA. Defs.' Mot. at 17; Pl.'s Resp. at 15-18. However, with or without ERISA-covered plans, the County's claim would proceed with respect to Defendants' formularies and UM techniques adopted by plans offered by government or religious entities and individual plans offered by insurers. *See* 29 U.S.C. § 1003 (specifying that ERISA regulates plans provided by private employers); *see also id.* (excepting governmental plans and church plans, among others); *Rutledge v. Pharm. Care Mgt. Ass'n*, 592 U.S. 80, 88-89 (2020) (holding that an Arkansas law regulating the price at which PBMs reimburse pharmacies for the cost of prescription drugs covered by health plans "does not act immediately and exclusively upon ERISA plans because it applies to PBMs whether or not they manage an ERISA plan"); *Alaska*, 2024 WL 2321210, at *9 (finding the existence of ERISA-covered plans was not essential to the State of Alaska's claims against Express Scripts).

Under the second "connection with" category, a state law has an impermissible connection with ERISA plans if the "acute, albeit indirect, economic effects . . . force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Travelers*, 514 U.S. at 668. Put differently, a state law has an impermissible connection with ERISA if it would "require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status." *Rutledge*, 592 U.S. at 86-87 (citations omitted); *see also Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1198 (10th Cir. 2023) (holding state laws governing PBMs preempted where "they at least "'eliminate[ ] the choice of one method of structuring benefits'" (alteration in original) (quoting *CIGNA Healthplan of La., Inc. v. State of La. ex rel. Ieyoub*, 82 F.3d 642, 648

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 18

(5th Cir. 1996))). However, ERISA does not preempt state law if the law "merely affects costs" or "alter[s] incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." *Rutledge*, 592 U.S. at 87-88.

The County's public nuisance claim does not have an impermissible "connection with" ERISA plans. Defendants are correct that the County's claim targets Defendants' plan administration. For example, the County alleges that Defendants promoted opioid use by giving opioids preferential formulary placement and not employing UM techniques that would limit access to opioids. Amended Compl. ¶¶ 10, 14, 191, 245, 455(c)-(e). But the County's success on its claim would not dictate any particular scheme of coverage. Granting the County's requested relief—that Defendants be enjoined from continuing the alleged nuisance-creating conduct—would not require Defendants to cover alternative, non-medication treatments, cover treatments considered less addictive, or otherwise structure benefit plans in any particular manner. *See id.* at 140; *Rutledge*, 592 U.S. at 87-88; *Alaska*, 2024 WL 2321210, at *10. Rather, as the district court in *Alaska* concluded in addressing this same issue, Defendants could structure formularies in the same manner because the claim at issue is "not merely based on the structure of the formularies, but on the manner in which [Defendants] arrived []at their structure." *Alaska*, 2024 WL 2321210, at *10. In other words, Defendants could retain the same formulary structures and UM techniques provided that doing so is not part of a greater scheme to collude with opioid manufacturers to maximize profits derived from opioid prescriptions. There is no ERISA preemption.

**D.  Whether Medicare Part D Preempts the County's Claim**

Defendants next argue that the County's claim is preempted by Medicare Part D. Defs.' Mot. at 19-20. Medicare Part D provides prescription drug benefits to those who are eligible for

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

benefits under Medicare Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(1), (a)(3)(A). Medicare Part D is structured as a public-private partnership under which private insurance companies administer Part D's prescription drug benefits, usually through PBMs. *See* 42 C.F.R. § 423.4; *Cares Cmty. Health v. United States Dep't of Health & Human Servs.*, 944 F.3d 950, 954 (D.C. Cir. 2019) (quoting *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 749 (3d Cir. 2017)).

Medicare Part D incorporates an express preemption clause from Medicare Part C. *See* 42 U.S.C. § 1395w-112(g) (incorporating by reference 42 U.S.C. § 1395w-26(b)(3)). The clause provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part D] plans which are offered by [Plan D plan sponsors] under this part." *Id.* § 1395w-26(b)(3); 42 C.F.R. § 423.440(a). "The federal scheme preempts a state law when (1) Congress or the Centers for Medicare and Medicaid Services (CMS) has established 'standards' in the area regulated by the state law; and (2) the state law acts 'with respect to' those standards." *Pharm. Care Mgmt. Ass'n v. Rutledge*, 891 F.3d 1109, 1113 (8th Cir. 2018), *rev'd on other grounds*, 592 U.S. 80 (2020). Among other things, CMS regulations require that "[a] Part D sponsor that uses a formulary under its qualified prescription drug coverage" must meet certain requirements. 42 C.F.R. § 423.120(b). For example,

> [a] Part D sponsor's formulary must be developed and reviewed by a pharmacy and therapeutic committee that . . . [b]ases clinical decisions on the strength of scientific evidence and standards of practice . . . [c]onsiders whether the inclusion of a particular Part D drug in a formulary or formulary tier has any therapeutic advantages in terms of safety and efficacy . . . [and] [r]eviews policies that guide exceptions and other utilization management processes, including drug utilization review, quantity limits, generic substitution, and therapeutic interchange.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

1    *Id.* § 423.120(b)(1)(v)-(vii).

2          Defendants argue that the County's claim implicates standards established under Medicare

3    because CMS regulates Part D formularies, drug coverage, and UM techniques. Defs.' Mot.

4    at 19-20. However, as discussed *supra*, the gravamen of the County's Amended Complaint is that

5    Defendants colluded with opioid manufacturers to promote opioid use for financial gain. As such,

6    the County's success on its claim would not dictate that Defendants provide or not provide any

7    specific formularies or UM techniques. Accordingly, the County's pleading demonstrates that the

8    County's requested relief can be granted without affecting CMS standards. There is no Medicare

9    Part D preemption.

10        **E.  Whether Optum, Inc. Should be Dismissed**

11         Finally, Defendants maintain that Optum, Inc. should be dismissed as every allegation about

12   Optum, Inc. focus on its various subsidiaries. Defs.' Mot. at 20. Defendants correctly point out that

13   "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that

14   a parent corporation . . . is not liable for the acts of its subsidiaries." *Id.* (quoting *United States v.*

15   *Bestfoods*, 524 U.S. 51, 61 (1998)). Here, however, the County sufficiently alleges a claim against

16   Optum, Inc. According to the County, in 2017, Optum, Inc. acquired DaVita Medical Group, which

17   operates clinics that provide care for more than 330,000 patients across multiple Washington State

18   counties. Amended Compl. ¶ 117. The County further alleges that "Optum, Inc. was actively

19   involved in promoting opioid programs to its clients and the media and coordinating the efforts of

20   its subsidiary entities." *Id.* ¶ 174. Additionally, the County alleges that Optum, Inc. lobbied state

21   governments to promote its opioid programs and collaborated with opioid manufacturer Purdue

22

23

24   ORDER DENYING DEFENDANTS'
     MOTION TO DISMISS

25

Pharma on studies and presentations that promoted opioid use. *Id.* ¶¶ 174, 305. Taking these allegations as true, the County has sufficiently alleged a public nuisance claim against Optum, Inc.

### V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Dkt. No. 57) is DENIED.

**IT IS SO ORDERED.**

DATED this 10th day of April 2025.

_____
Barbara Jacobs Rothstein
United States District Court Judge

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

- 22